# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

_____

MICHAEL M. ANDERSON,

        Plaintiff,


v.                          **MEMORANDUM OF LAW & ORDER**
                                Civil File No. 09-251 (MJD/FLN)


GRAYBAR ELECTRIC COMPANY, INC.,

        Defendant.

_____

Clayton D. Halunen and Shawn J. Wanta, Halunen & Associates, Counsel for Plaintiff.

Jacqueline A. Mrachek and Megan J. Backer, Nilan Johnson Lewis PA, Counsel for Defendant.

_____

## I.    INTRODUCTION

This matter is before the Court on Defendant's Motion for Summary

Judgment.  [Docket No. 38]  The Court heard oral argument on April 16, 2010.

## II.    BACKGROUND

### A.    Factual Background

## 1. Parties and Background

Plaintiff Michael Anderson is a former employee of Defendant Graybar Electric Company, Inc. ("Graybar"). (Paschke Aff. ¶ 6.)

Graybar distributes equipment and materials for the electronic and telecommunications industries. (Paschke Aff. ¶ 2.) Graybar is headquartered in St. Louis, Missouri, and has a warehouse and distribution center in Minneapolis, Minnesota. (Id. ¶ 3.)

Cindy Paschke is the Minneapolis District Human Resources Manager. (Paschke Aff. ¶ 1.) Jamie Phillips is the District Operations Manager. (Id. ¶ 5.) Bill Keller is the District Vice President. (Id.)

Anderson worked full-time as a material handler in the receiving department at the Graybar Minneapolis warehouse, starting on January 15, 2001. (Paschke Aff. ¶ 6.) Anderson's last day with Graybar was February 18, 2008. (Mrachek Aff., Ex. H.) Anderson's primary duties were to accept and put away incoming freight with a forklift. (Mrachek Aff., Exs. J, K.)

## 2. Premier Incident

During the summer of 2006, Anderson provided a memorandum (the "Premier Memo") to Keller, Phillips, Branch Manager Scott Schuenke, and

Manager of Customer Service Kyle Johnson.  (Mrachek Aff., Ex. M.)  The Premier

Memo alleged that Graybar had violated federal laws when filling orders for

Premier Electrical Corporation ("Premier").  Specifically, Anderson alleged that,

in fulfilling orders for Premier's project for the Air National Guard, Graybar

removed labels of the foreign country of origin and repackaged goods so that

either the country of origin was not identified or the products were labeled

"Made in USA."  (Id.)  Email evidence shows that Minneapolis Warehouse

Manager Gary LeTendre had ordered employees to remove "Made in China" and

other country of origin markers from product packaging going to Premier.

(Halunen Decl., Ex. Z.)

    Upon receiving the Premier Memo on August 8, Keller issued a directive to

Graybar employees to stop repackaging Premier products related to the Air

National Guard project and to stop filling orders for "Made in USA" products.

(Mrachek Aff., Ex. N.)  Keller and Phillips met with Anderson on August 9, 2006.

(Phillips Dep. 10-11, 17, Mrachek Aff., Ex. B; Mrachek Aff., Ex. S.)  Anderson

explained the repackaging scheme and also raised five warehouse safety issues.

(Id.)

    Graybar launched an internal investigation.  According to that

investigation, Premier initiated the scheme and Graybar employees attempted to satisfy Premier's needs. (Mrachek Aff., Ex. O.) As a result of the investigation, Graybar fired Schuenke and Johnson because they knew or should have known of the practice and stopped it. (Id.)

As part of both the Graybar and Government investigations, LeTendre was interviewed two or three times. (LeTendre Dep. 99, Halunen Decl., Ex. T.) Ultimately, while Graybar terminated two managers, it did not terminate LeTendre, who was Anderson's direct supervisor.

At some point, Keller issued another directive stating that Graybar would no longer do business with Premier on its Air National Guard job, that no repackaging of products should be done without management approval, and that all orders for Premier must be approved by Keller or Phillips. (Mrachek Aff., Exs. N, Q.) Anderson testified that the repackaging practice stopped as soon as he reported it in the summer of 2006. (Anderson Dep. 150-51, Mrachek Aff., Ex. A.) Anderson had also contacted the FBI regarding the Premier repackaging scheme, although the outcome of that report is unclear. (Id. 151.)

In January 2007, the Defense Criminal Investigative Service of the Office of the Inspector General, Department of Defense, conducted an investigation of the

Premier incident. (Mrachek Aff., Ex. R.) The Government viewed Graybar as a witness, not the target of the investigation, and no warning or other penalty was issued to Graybar; nor was there a finding that Graybar had engaged in unlawful activity. (Id.; Bullerdick Aff. ¶ 2.)

### 3. 2006 Safety Complaints

During the August 9, 2006 meeting, Anderson raised five safety concerns: damaged racking, the need for complete personal protective equipment at the battery station, the need for training on how to refill the batteries, signage hanging from a gas pipe, and the sweeper blocking the eye wash station. (Phillips Dep. 10-11, 17, 20, Mrachek Aff., Ex. B; Mrachek Aff., Ex. S.) Phillips claims she addressed all of these the concerns. (Mrachek Aff., Ex. S.) A racking safety inspection by Storage Equipment, Inc., recommended replacing 50 of the 14'x44" deep Interlake uprights. (Mrachek Aff., Ex. T.) Graybar ordered new uprights and installed new leg protectors. (Mrachek Aff., Exs. S, Y.)

On October 20, 2006, Anderson stated in his annual self-evaluation that he was happy in receiving and that there were no training or development actions that he wanted to take. (Mrachek Aff., Ex. U.) LeTendre wrote that Anderson had brought safety issues to management's attention, the issues were corrected or

in the process of being corrected, and Graybar encouraged Anderson to communicate such issues to supervisors.  (Id.)

### 4.  Safety Council

In November 2006, after Johnson was terminated, Graybar hired Lisa Matuska as the Manager of Customer Service.  (Matuska Dep. 23-24, Mrachek Aff., Ex. C.)  Because Matuska had initiated a safety council at the Rogers branch and had a good safety record there, Phillips asked her to implement a safety council at the Minneapolis branch.  (Id. 28-29.)  Matuska planned to eventually only have employees on the safety council in order to encourage more participation by others.  (Id. 38.)

The safety council first met in January 2007 with Anderson, Matuska, LeTendre, and two other employees.  (Mrachek Aff., Ex. V.)  They discussed safety issues, including the damaged racking and foot guards to be installed by January 31, 2007, lighting in the parking lot, unauthorized use of pallets, unauthorized people in the warehouse without escorts, and improvements in safety over the last year, including in the battery changing area, eye wash station, and completion of racking replacements.  (Id.)  There was no mention of overloading forklifts or disposal of florescent lights.  (Mrachek Aff., Ex. V;

Anderson Dep. 121, Mrachek Aff., Ex. A.)

The next safety council meeting occurred in March 2007, and Anderson became the committee chair. (Mrachek Aff., Ex. X.) Matuska and LeTendre announced that they would not be attending any further meetings. (Id.) The council discussed forklifts and the need to use horns, but there was no mention of overloaded forklifts. (Id.) The council also discussed that almost all of the damaged racking had been replaced but that there were other racking issues, such as the need to straighten racking out. (Id.)

The Minneapolis District safety council met in September 2007 and, among other things, discussed the warehouse racking. (Mrachek Aff., Ex. Z.)

According to Anderson, the Minneapolis safety council functioned from January 2007 until April 2007, when Matuska announced that LeTendre and Matuska would no longer participate.

Anderson points out that the safety council's recommendations were not binding and its minutes and recommendations were not shared with Phillips, unless her approval was needed. (Matuska Dep. 39.)

### 5.    Racking System

At some point, years earlier, a portion of Graybar's Minneapolis

warehouse racking system collapsed, but no one was injured. (Anderson Dep. 68-69, Halunen Decl., Ex. A; Matuska Dep. 55-56, Halunen Decl., Ex. C.)

Plaintiff thought that the racking system in his workplace was dangerous. He testified: "The supports were damaged so they do not have the original structural integrity that they did when they were new. So since they were damaged, they obviously do not have the capacity to hold 6,000 pounds per shelf." (Anderson Dep. 140, Halunen Decl., Ex. A.) LeTendre told Anderson that the racking could still hold 6,000 pounds per shelf. (Id.) An inspection conducted on February 26, 2008, a few days after Anderson's employment ended, showed five safety issues with the racking. (Halunen Decl., Ex. N.) For example, the inspector concluded that most of the 350 upright racks in the warehouse did not meet industry standards because they were not anchored. (Id.)

### 6.    Forklifts

During the time Anderson worked for Graybar, the largest forklift in the Minneapolis warehouse was certified to lift a maximum of 5,250 pounds. (Halunen Decl., Ex. O; Matuska Dep. 56, Halunen Decl., Ex. C; LeTendre Dep. 102-03, Halunen Decl., Ex. T.) However, Graybar also had riding pallet jacks capable of moving, but not lifting onto racking, up to 8,000 pounds. (Matuska

8

Dep. 56.)  Anderson notes that Graybar ordered and received reels of wire that weighed more than the capacity of the highest-rated forklift.  (Halunen Decl., Exs. P-S.; LeTendre Dep. 102, 105, Halunen Decl., Ex. T.)  LeTendre, the warehouse manager, testified that it is usually unsafe to exceed the weight capacity.  (LeTendre Dep. 107-08.)  He further testified: "My experience, reels that are in excess, unless you lift it, you can't push it."  (Id. 106.)

According to Anderson, shortly before his employment was terminated, he told LeTendre that Graybar and the forklift salesperson were improperly testing a new forklift with a reel that was heavier than the new forklift's capacity.  (Anderson Dep. 102, Halunen Decl., Ex. A.)  LeTendre told Anderson to "just mind your own business.  Go do your work."  (Id.)

### 7.    Light Bulb Disposal

Anderson claims that Graybar required some Minneapolis warehouse employees to smash florescent light bulbs into open cardboard barrels.  (Anderson Dep. 111-12, 114, Halunen Decl., Ex. A.)  He observed employees stand over the barrel and break lights into it and breathe clouds of particulates.  (Anderson Dep. 114-16.)  He believed some components of florescent light bulbs may be considered hazardous waste.  (Anderson Dep. 112.)

### 8.    Self-Evaluation

On Friday, February 15, 2008, Anderson submitted his annual self

evaluation to LeTendre.  (Anderson Dep. 206-07, Halunen Decl., Ex. A.)

Anderson attached a list to his self evaluation, recounting eight things that made

Anderson's job difficult to perform.  (Halunen Decl., Ex. HH.)  In the document,

he stated:

> #1. Graybar management continues to ignore serious safety issues in
> my assigned work area.
>
> #2. Graybar management refuses to follow some manufactures [sic]
> safety warning[]s concerning the use, installation and repair of some
> warehouse equipment in my assigned work area.
>
> #3 Graybar management refuses to follow some OSHA guidelines.
>
> #4. Graybar management does not follow the Graybar G.I. (General
> Instructions)
>
> #5 The duties assigned me by Graybar management put[] me in a
> position to be injured because of Graybar management's refusal to
> follow some OSHA guidelines, man[ufacturer's] safety warnings
> and or its own G.I.  It also puts me in the unfortunate position that I
> might cause serious injury to another warehouse worker for the
> same reason.
>
> #6. Graybar management has ignored the Minneapolis Safety
> Council's recommendation's on some serious safety issues.
>
> #7. I have discussed these issues with five current member of

management with only negative results.

> #8. I believe beyond a shadow of doubt that Graybar not providing me with a safe working environment is a direct result of my speaking out about Graybar's fraudulent business dealing[]s.

(<u>Id.</u>)

### 9. Termination of Anderson's Employment

A few minutes after Anderson gave LeTendre his self-evaluation, LeTendre reviewed it and called his supervisor, Matuska, saying, "I think you need to see Mike's supplement." (LeTendre Dep. 165, Halunen Decl., Ex. T.) LeTendre testified that he referred the report to Matuska because it contained "derogatory statements toward management." (LeTendre Dep. 169, Halunen Decl., Ex. T.) He explained that it was unusual to attach something to the self evaluation and the comments were vague. (<u>Id.</u> 165)

LeTendre brought the self evaluation to Matuska, who then brought it to branch manager, Rick Schroeder. (Matuska Dep. 74, Halunen Decl., Ex. C.) Schroeder is the one of the highest ranking managers at the Minneapolis warehouse. (<u>Id.</u> 82.) He has the power to hire and fire employees. (Schroeder Dep. 27, Halunen Decl., Ex. JJ.) Schroeder asked Matuska to arrange a meeting with Anderson as soon as possible. (Matuska Dep. 79, Halunen Decl., Ex. C.)

At 8:00 a.m., on Monday, February 18, 2008, Schroeder met with Matuska and Anderson. (Matuska Dep. 82-84, Halunen Decl., Ex. C.) The meeting lasted a few minutes. (Id. 84.) Schroeder asked Anderson to explain the content of the self evaluation, but Anderson stated that he did not want to discuss it with them. (Id. 84-85, 132.) Matuska testified that she stated that they really should discuss the issues and Anderson responded that he was "taking it to a higher level," and then left the room. (Id. 85-86.)

According to Anderson, Anderson replied, "I [am] filing a complaint." (Anderson Dep. 190, Halunen Decl., Ex. A.) Also according to Anderson, Schroeder responded that Anderson was fired. (Anderson Dep. 168, 170, Halunen Decl., Ex. A.)

Matuska and Schroeder attempted to contact Anderson by telephone two times on Wednesday, February 20. (Mrachek Aff., Ex. DD.) But Anderson did not answer and there was no way to leave a message. (Id.; Anderson Dep. 171, Mrachek Aff., Ex. A.)

### 10.    February 21, 2008, Letter

On Thursday, February 21, Matuska sent Anderson a letter by certified mail asking whether he intended to return to work. The letter stated:

On Monday, February 18, 2008, Rick Schroeder and I met with you to discuss the document that you attached to your employee self-evaluation.  In this document you wrote that there were existing safety issues, which you had discussed with five managers and had negative results.  We were very puzzled by this document as we are unaware of any current safety issues in our warehouse nor do we have any idea what you meant by negative results.  We are committed to providing a safe working environment and want to know your concerns.

When we asked you what safety issues you were concerned about, you refused to tell us and left the office.  You stated that you would not tell anyone in management your concerns.  Later in the day, we learned that after our meeting, you left the building without telling any manager and have not yet returned to work. We also learned that you told a co-worker that you were fired.  We do not know why you would have said this, as there was no discussion of termination in our meeting.

Your absences since February 18th are unexcused.  We have tried to contact you 2 times on February 20th to determine the reason for your absences, but we have not been able to reach you. Therefore, please contact us no later than the end of the second business day following your receipt of this letter if you intend to return to work. If we do not hear from you by such time, we will consider you to have voluntarily resigned per our attendance guidelines.

(Mrachek Aff., Ex. H.)

Anderson received the letter on February 21, 2008, but did not contact

Graybar.  (Mrachek Aff., Ex. FF.)

Anderson testified that he ignored the letter because, "This letter wasn't

sent in good faith. This letter was sent to cover their own butts. And I wasn't

about to go back and demean myself further to them. They had fired me. I

accepted that." (Anderson Dep. 178-79, Mrachek Aff., Ex. A.)

Graybar sent another letter to Anderson one week later stating that he had

resigned his employment through job abandonment. (Mrachek Aff., Ex. GG.)

## 11. Minnesota Department of Labor and Industry MNOSHA Complaint

Graybar received a letter from the Minnesota Department of Labor and

Industry, MNOSHA, which enforces Minnesota's Occupational Safety and

Health Act, also termed "MNOSHA", dated February 22, 2008, listing Anderson's

complaints in a complaint received that day. (Mrachek Aff., Ex. HH.)

Specifically, Anderson alleged unsafe racking, overloaded forklifts, and

hazardous light bulb disposal.

Graybar responded to MNOSHA and asserted that all of the racking

problems had been addressed, that there was adequate forklift training and that

there was no overweight cargo on the forklifts, that florescent lights are disposed

of in a well-ventilated area with proper protective gear available, and that, in any

case, according to the manufacturer's information, breaking lamps does not

create significant exposure to mercury or phosphor.  (Mrachek Aff., Ex. Y.)

MNOSHA never conducted an on-site investigation, never followed up, and never issued citations or fines to Graybar.  (Mrachek Aff., Ex. EE.)

### 12.    Police Report

According to Matuska, in early March 2008, an employee informed her that Anderson had made a threatening comment as he was leaving the building on February 18.  (Matuska Dep. 95, Mrachek Aff., Ex. C.)   He said something along the lines of "remember what happened at NIU."  (Matuska Dep. 95, 101, Mrachek Aff., Ex. C; Mazurs Dep. 20, Mrachek Aff., Ex. G.)  Matuska testified that, previously, someone disgruntled with Northern Illinois University had come back to the school and opened fire.  (Matuska Dep. 95.)

Matuska called Graybar security, reported what the employee had told her, and was told to call the police about the threat.  (Matuska Dep. 98-99, Halunen Decl., Ex. C.)  She called the Minneapolis Police Department and reported the threat, and they contacted Anderson and told him to stay away from Graybar.  (Id. 99-100.)

There is conflicting testimony regarding whether Anderson said anything about "another NIU" after he was terminated.  Anderson argues that the rumor

was started by an employee who admittedly does not like him.  (Mazurs Dep. 33-34, Halunen Decl., Ex. B.)

**B.     Procedural Background**

On approximately January 6, 2009, Anderson served a Complaint on Graybar in Hennepin County District Court.  The Complaint alleged Count One: Violation of False Claims Act, 31 U.S.C. § 3730(h); and Count Two: Violation of Minnesota Whistleblower Act.

On February 4, 2009, Graybar removed the matter to this Court based on both federal question and diversity jurisdiction.

Graybar now moves for summary judgment on all claims against it. Anderson has stipulated to the dismissal of Count One, so only Count Two, the whistleblower claim, remains.  [Docket No. 54]

**III.   DISCUSSION**

**A.     Summary Judgment Standard**

Summary judgment is appropriate if, viewing all facts in the light most favorable to the non-moving party, there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).  The party seeking

summary judgment bears the burden of showing that there is no disputed issue

of material fact.  <u>Celotex</u>, 477 U.S. at 323.  Summary judgment is only appropriate

when "there is no dispute of fact and where there exists only one conclusion."

<u>Crawford v. Runyon</u>, 37 F.3d 1338, 1341 (8th Cir. 1994) (citation omitted).

### B.    Legal Standard for Minnesota Whistleblower Act Claim

Under Minnesota Statute § 181.932, subdivision 1,

> An employer shall not discharge, discipline, threaten, otherwise
> discriminate against, or penalize an employee regarding the
> employee's compensation, terms, conditions, location, or privileges
> of employment because:
>
> (1) the employee . . .  in good faith, reports a violation or suspected
> violation of any federal or state law or rule adopted pursuant to law
> to an employer or to any governmental body or law enforcement
> official . . . .

The Court applies the <u>McDonnell Douglas</u> analysis to Anderson's

whistleblower claim.  <u>Cokley v. City of Otsego</u>, 623 N.W.2d 625, 630 (Minn. Ct.

App. 2001).

> [T]he employee has the initial burden to establish a prima facie case,
> and the burden of production then shifts to the employer to
> articulate a legitimate, non-retaliatory reason for its action, after
> which the employee may demonstrate that the employer's
> articulated reasons are pretextual.  At all times the employee has the
> burden to prove by a preponderance of evidence that the employer's
> action was for an impermissible reason.

Id. (citations omitted).

In order to establish his prima facie case, Anderson "must show: (1) statutorily-protected conduct by the employee; (2) adverse employment action by the employer; and (3) a causal connection between the two." Id. (citation omitted). "A whistleblower claim need not identify the specific law or rule that the employee suspects has been violated, so long as there is a federal or state law or rule adopted pursuant to law that is implicated by the employee's complaint, the employee reported the violation or suspected violation in good faith, and the employee alleges facts that, if proven, would constitute a violation of law or rule adopted pursuant to law." Abraham v. County of Hennepin, 639 N.W.2d 342, 354-55 (Minn. 2002) (citation omitted).

C. **Prima Facie Case**

1. **Statutorily Protected Conduct**

Graybar argues that Anderson did not engage in statutorily-protected conduct.

a. **Legal Definition of Report**

In order to determine whether a report of a violation or suspected violation of law is made in good faith, we must look not only at the content of the report, but also at the reporter's purpose in making

18

the report. The central question is whether the reports were made
for the purpose of blowing the whistle, i.e., to expose an illegality.
We look at the reporter's purpose at the time the reports were made,
not after subsequent events have transpired.

Obst v. Microtron, Inc., 614 N.W.2d 196, 202 (Minn. 2000) (citations omitted).

The employee does not need to identify the specific law that he believes

was violated, but there must be an actual federal or state law or rule implicated

by the facts asserted in the employee's complaint. Kratzer v. Welsh Cos., 771

N.W.2d 14, 22 (Minn. 2009). A mere violation of company policy is insufficient.

Amin v. Flagstone Hospitality Mgmt., LLC, No. 03-1181 (JRT/JSM), 2005 WL

3054599, at *6 (D. Minn. Nov. 14, 2005).

A "report" does not need to be made in a formal manner in order to receive

whistleblower protection. See Skare v. Extendicare Health Servs., Inc., 515 F.3d

836, 841 (8th Cir. 2008).

Anderson claims that his reports highlighted violations of MNOSHA,

Minn. Stat. § 182.653, subd. 2, which requires that employers keep the work area

"free from recognized hazards that are causing or are likely to cause death or

serious injury or harm to its employees."

### b.    Light Disposal and Forklift Concerns

Anderson's discussions regarding light disposal and forklift concerns are not relevant conduct for his claim because there is no competent evidence that he raised them before he left Graybar's employment. Anderson specifically testified that he did not raise those concerns before his employment ended. (See Anderson Dep. 122, Halunen Decl., Ex. A ("Q. And you recall raising these concerns prior to your departure from Graybar? A. Not the lamps and not the forklifts. Q. You raised these after you left? A. Yes. The racking I recall before, but – yeah, that's all I recall.").) Because the alleged retaliatory conduct occurred before Anderson's MNOSHA complaint was revealed to anyone at Graybar, no report occurred. (Id. 116.) Also, these allegations are not listed in the minutes of the Safety Council, which Anderson reviewed and approved or in his documented conversation with Phillips in early August 2006.

Anderson also testified that he did not have specific memories of discussing light disposal with coworkers. (Anderson Dep. 118.) In any case, discussions with coworkers do not constitute "reports." Kasper v. Federated, 425 F.3d 496, 503 n.3 (8th Cir. 2005). Anderson further testified that he had no "specific memory" of talking to LeTendre about the issue. (Anderson Dep. 118.) He then went on to testify that he had talked to LeTendre about the disposal of

the lamps in 2006.  (Id. at 118-19.)  This testimony not only contradicts his testimony that he did not report the issue until after his termination, but also is not based on a "specific memory," and allegedly occurred years before Anderson was terminated.

As for Anderson's testimony regarding reports of the forklift loading issues, there are possibly two forklift reports before he was terminated.  One was a hazy memory of a report to former Manager of Customer Service Kyle Johnson in late 2005 or 2006 (Anderson Dep. 100-01, Halunen Decl., Ex. A.)  Johnson was fired after the Premier incident and replaced by Matuska.  A hazy memory of a statement years before Anderson suffered his adverse employment action, made to an individual who, himself, was fired years before Anderson suffered his adverse employment action cannot form the basis for protected conduct.

The other possible forklift report was in 2008 when Anderson told LeTendre and others during a demonstration of a new forklift with a forklift salesman that the forklift was lifting more than its capacity during the demonstration.  This comment was regarding safety during a singular demonstration event, not a statement that employees were being required to operate forklifts in an illegal manner.

In any case, all of these possible reports are contradicted by Anderson's own testimony that he did not report the light bulbs or forklifts until after his employment ended. Reports made after his employment ended cannot form the basis for a whistleblower retaliation claim.

### c. Racking

Anderson claims that he regularly complained to co-workers and management that the racking was unsafe because it was damaged and that many of the damaged racking needed to be repaired. (Anderson Dep. 81, 83-84, 88, 98, Halunen Decl., Ex. A.) He further testified that he thought that damaged racking would likely lead to a harmful condition because the racking in Graybar's Minneapolis warehouse had previously collapsed. (See id. 68-69.)

Graybar argues that, these complaints are too vague to implicate a violation of actual law. Also, it asserts that there is no state or federal law or regulation that requires that 14-foot racking be bolted to the ground or to each other. There are no OSHA regulations specifically addressing warehouse racking. Graybar's expert further opined that the racking did not violate the general duties of OSHA because the "damage did not appear to be extensive enough to significantly weaken the vertical support." (Russell Report, Mrachek

Aff., Ex. EE.)

Anderson complained to Graybar management regarding damaged racking from at least August 2006 through the end of his employment. While it may be that the racking was not damaged enough to cause a collapse, that determination does not mean that Anderson's complaints were not reports because "[t]he proper standard to apply when assessing the legal sufficiency of a claim under the whistleblower statute is to assume that the facts have occurred as reported and then determine . . . whether those facts constitute a violation of law or rule adopted pursuant to law." Kratzer, 771 N.W.2d at 22. Anderson has provided evidence of his good faith belief that the racking was so damaged that it would collapse and that racks that damaged would constitute a violation of MNOSHA.

### d. Self Evaluation

Anderson also asserts that his February 2008 self evaluation constitutes a report on safety issues to support his whistleblower claim. Graybar argues that the self evaluation was too vague to constitute a viable report because it does not provide enough information to notify Graybar of any alleged violation of law. See Chinander v. Andersen Windows, Inc., Civil No. 07-4565 (DWF/AJB), 2008

WL 5104691, at *7-*8 (D. Minn. Nov. 26, 2008) (holding no report when employee reported general safety concerns and need for more training because he failed to established that co-worker "lacked any specific training that he was required to have under law").

If read in isolation, the self evaluation would, indeed, be too vague to implicate a violation of a law. However, when read in the context of Anderson's constant reports regarding damaged racking, a reasonable fact finder could interpret the self-evaluation as another report about the damaged racking.

### e.    False Claims Act Report

Anderson further asserts that, in his February 2008 self evaluation, he reported that Graybar was retaliating against him because he investigated Graybar for its fraudulent conduct in connection with the Premier project. The evaluation states: "I believe beyond a shadow of doubt that Graybar not providing me with a safe working environment is a direct result of my speaking out about Graybar's fraudulent business dealing[]s."

Anderson surmises that LeTendre retaliated against Anderson because Anderson had reported LeTendre's involvement and LeTendre was interviewed on multiple occasions. Anderson claims that he investigated Defendant's illegal

conduct in contemplation of filing a claim under the FCA, and Graybar retaliated against him for doing so. For the purposes of the prima facie case, Anderson's statement constitutes a report.

### f. Duty to Report

Graybar also argues that, to the extent Anderson reported safety concerns during his employment, it was his duty as a member and chair of the safety council to address safety concerns at Graybar. A report presented as part of an employee's job duties is not protected conduct. Freeman v. Ace Telephone Ass'n, 404 F. Supp. 2d 1127, 1139 (D. Minn. 2005).

At a minimum, there is a genuine issue of material fact regarding whether Anderson had a duty to report safety concerns to Graybar. Paschke testified that safety reporting was not part of Anderson's job duties. (Paschke Dep. 43, Halunen Decl., Ex. II.) Also, Anderson testified that the safety council only met three times and disbanded. It had no authority to make any changes and, once management stopped participating in the meetings, there was no mechanism for the council to affect change. Taking these facts as true, reporting safety concerns regarding the racking was not a part of Anderson's job duties.

### 2. Adverse Employment Action

### a.    Police Report

Graybar infers that Anderson claims that the Matuska's report of his threat to the police constitutes an adverse employment action.   First, it is not clear to the Court that Anderson does assert that Matuska's act of filing a police report constituted an adverse employment action.   Second, because no further police action occurred, beyond telling Anderson to stay away from Graybar, the report does not appear to constitute an adverse employment action.   In any case, although Anderson disputes that he made the NIU comment as he left the building and presents evidence that the employee who reported the NIU comment to Matuska may have been biased and, therefore, lied, Anderson has not presented any evidence to dispute that Matuska received information from that employee that Anderson had made the comment or that she acted on that information when calling the police.   Therefore, there is no evidence to suggest that Matuska's report was false. A good faith complaint to the police, which results in no police or legal action does not constitute an adverse legal action. See, e.g., Dick v. Phone Directories Co., 397 F.3d 1256, 1269 (10th Cir. 2005) (holding that "[f]iling false criminal charges against, or the malicious prosecution of, an employee can constitute an adverse employment action" but holding

coworkers' complaint to the police, which resulted in a police report but no further action, "cannot be considered an adverse employment action").

### b. Discharge

Anderson claims Graybar took adverse employment action against him when it discharged him one business day after he had made a written report of hazardous conditions in the Minneapolis warehouse and moments after he informed Schroeder that he intended to file another complaint. Discharge is an adverse action under the Whistleblower Act. Although Graybar claims that Anderson abandoned his job, there is a genuine issue of material fact regarding this point.

### 3. Causal Connection

The causation element may be satisfied "by evidence of circumstances that justify an inference of retaliatory motive, such as a showing that the employer has actual or imputed knowledge of the protected activity and the adverse employment action follows closely in time." Dietrich v. Canadian Pac. Ltd., 536 N.W.2d 319, 327 (Minn. 1995) (citation omitted).

### a. Premier Incident

There is no evidence of a causal connection between Anderson raising the

Premier issue and his alleged discharge. Anderson testified that Schroeder was the person who fired him, yet there is no evidence that Schroeder had knowledge that Anderson had reported the Premier issue. (Schroeder Dep. 50-57, 102, Mrachek Aff., Ex. E.) Schroeder did not participate in the Premier investigation, and he never saw the Premier Memo. (Id.) There is no evidence that Schroeder knew of the alleged statutorily protected conduct; therefore, there is no causal connection between the alleged protected conduct and Anderson's discharge. See, e.g., Alexander v. Wisconsin Dept. of Health & Family Servs., 263 F.3d 673, 688 (7th Cir. 2001) ("Although the timing of an adverse employment action can be evidence of an act of retaliation, [the plaintiff]'s inability to provide evidence that any of the actors involved in his suspension . . . had any knowledge of his complaint before his suspension, prevents any such inference to be drawn from the timing of his suspension and eventual termination.") (citation omitted).

Furthermore, there was a year and a half between the time Anderson raised the Premier issue and the fraudulent activity was stopped and Anderson's alleged discharge. Regardless of Schroeder's knowledge, this time period is too long to establish causation. See, e.g., Kipp v. Mo. Highway & Transp. Comm'n, 280 F.3d 893, 897 (8th Cir. 2002) (holding two-month gap between discrimination

complaint and termination "dilutes" an inference of causation in Title VII

retaliation claim).

### b. Racking Complaints

There is a genuine issue of material fact as to the causal connection

between Anderson's reports of workplace racking hazards and his possible

discharge one business day after the last report on Friday, February 15, 2008.  The

concerns raised in the February 15 self evaluation are vague, but if they are

interpreted to reference the previous ongoing, unresolved complaints about

racking, then there is close temporal proximity. Based on the facts most favorable

to Anderson, within one hour of Anderson turning in his self evaluation,

LeTendre contacted Matuska for disciplinary measures.  Schroeder arranged a

meeting with Anderson as soon as possible and discharged Anderson within

minutes of the start of the meeting.  This close temporal proximity is sufficient to

survive a motion for summary judgment.

### D. Legitimate Nondiscriminatory Reason and Pretext

Plaintiff argues that Graybar has offered no legitimate reason for firing

him.  Therefore, it has failed to meet its burden under McDonnell Douglas.

Graybar retorts that it never fired Anderson.  Anderson walked out and never

responded to Graybar's letter, thereby abandoning his job.  Plaintiff does not

address pretext at all because he claims that Defendant has failed to offer a

legitimate nondiscriminatory reason for firing him.  As the Court has already

noted, there is a genuine issue of material fact regarding whether Graybar fired

Anderson or not.

### E.    Mitigation

Graybar claims that Anderson failed to mitigate his damages by failing to

respond to its February 21, 2008 letter.

### 1.    Offer of Reinstatement

[A]bsent special circumstances, the rejection of an employer's
unconditional job offer ends the accrual of potential backpay
liability.  Thus, in general, the relevant period for measuring
backpay liability is the time between the termination and the
plaintiff's action upon an offer of reinstatement.  Nevertheless, if a
plaintiff reasonably rejects an offer of reinstatement, then the offer
does not terminate the accrual of backpay damages.  The refusal of a
reinstatement offer is measured by an objective standard: Generally,
it is the duty of the trier of fact to weigh the evidence to determine
whether a reasonable person would refuse the offer of reinstatement.

Smith v. World Ins. Co., 38 F.3d 1456, 1463-64 (8th Cir. 1994) (citations omitted).

Graybar argues that even though Anderson received its letter stating that

he had not been fired and asking him to contact it regarding his intent to return

to work, Anderson decided not to continue working at Graybar. Graybar concludes Anderson had the unconditional opportunity to continue to work at Graybar in the same position he had abandoned days earlier. It argues that Anderson was required to accept an unconditional offer of the job originally sought, and, after it made such an offer, any accrual of backpay liability is tolled.

The Court denies summary judgment on this point because Anderson had no obligation to accept an <u>unreasonable</u> offer of reinstatement. <u>Smith</u>, 38 F.3d at 1463. The employer bears the burden of proof to show that his rejection of a reinstatement offer was objectively unreasonable. <u>Id.</u> at 1465.

Taking the facts in the light most favorable to Anderson, a fact finder could find that Graybar's offer was unreasonable because Anderson could not be expected to return to an employment situation that was unsafe and where the employer continued to engage in illegal and retaliatory behavior. Even though Anderson had repeatedly reported racking hazards, Graybar refused to acknowledge that his reports had merit and wrote in its letter that it was not aware of any current safety issues in the warehouse. The reasonableness or unreasonableness of Anderson's decision to ignore Graybar's letter is for the fact finder.

### 2. Job Search

Graybar claims that, beyond failing to accept Graybar's offer of reinstatement, Anderson failed to mitigate damages through a reasonable job search. The Court concludes that there is a genuine issue of material fact regarding the reasonableness of Anderson's job search. While it does not appear that Anderson's job search was extensive, this is not a case in which a claimant did so little that the actions are insufficient as a matter of law. Nor has Graybar introduced evidence of the jobs that were available to Anderson. Cf. Hutton v. Sally Beauty Co., Inc., No. 4:02-CV-00190 SEB-WG, 2004 WL 2397606, at *4 (S.D. Ind. Oct. 22, 2004) (holding that, as a matter of law, plaintiff failed to mitigate when she only made one attempt to find a comparable managerial job and defendant had shown that such jobs were available).

Accordingly, based upon the files, records, and proceedings herein, **IT IS HEREBY ORDERED**:

Defendant's Motion for Summary Judgment [Docket No. 38] is **GRANTED IN PART** and **DENIED IN PART** as follows:

> 1. Count Two remains to the extent that it is based upon Plaintiff's allegation that he was fired based on his complaints about damaged and unsafe racking.

2. Count Two is dismissed to the extent that it is based upon complaints about the forklift, the light bulbs, or the Premier incident.

3. Summary judgment is denied on the issue of mitigation of damages.

Dated: June 18, 2010

s/ Michael J. Davis
Michael J. Davis
Chief Judge
United States District Court